IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| WENDY L. FARRISH, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:15-cv-70 |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

   Plaintiff Wendy L. Farrish asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by the

parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 9. Having considered the administrative

record, the parties' briefs, and the applicable law, I find that the Commissioner's decision is not

supported by substantial evidence and therefore **REMAND** the case for further administrative

proceedings.

## I. Standard of Review

   The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700,

704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the

2

burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden

shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Farrish applied for DIB and SSI on November 1, 2011, alleging disability caused by

rheumatoid arthritis, irritable bowel syndrome ("IBS"), and Graves' disease. Administrative

Record ("R.") 66, 76, ECF No. 11. At the time of her alleged onset date of December 1, 2007,[1]

she was thirty-eight years old, R. 66, 76, and had most recently worked as a school bus driver, R.

73, 83. Disability Determination Services ("DDS"), the state agency, denied her claims at the

initial, R. 66–74, 76–84, and reconsideration stages, R. 86–95, 97–106. On September 19, 2013,

Farrish appeared with counsel at an administrative hearing before ALJ Brian P. Kilbane, at

which time the ALJ heard testimony from Farrish and Casey Vass, a vocational expert ("VE").

R. 46–65.

ALJ Kilbane denied Farrish's claims in a written decision issued on October 25, 2013. R.

23–40. He found that Farrish had severe impairments of fibromyalgia, inflammatory arthritis,

degenerative disc disease, and inflammatory bowel disease ("IBD").[2] R. 26. Farrish's

---

[1] Farrish initially alleged an onset date of May 1, 2009. *Id.* At her administrative hearing, she asked to reopen an earlier application for benefits and amend her alleged onset date to December 1, 2007, which she claimed was the date she stopped working. R. 63–64. Although the ALJ did not expressly state whether he granted this request, his written opinion considers whether Farrish was disabled as of the amended onset date. *See generally* R. 23–40. Likewise, for purposes of this Memorandum Opinion, I will regard the amended onset date as the proper starting point for Farrish's alleged period of disability.

[2] IBD and IBS are distinct ailments. IBS "is a common disorder that affects the large intestine" and produces symptoms such as "cramping, abdominal pain, bloating, gas, diarrhea[,] and constipation," but does not often lead to severe symptoms or cause damage to the bowel tissue. *See Irritable Bowel Syndrome: Definition*, Mayo Clinic (July 31, 2014), http://www.mayoclinic.org/diseases-conditions/irritable-bowel-syndrome/basics/definition/con-20024578. By contrast, IBD, which includes Crohn's disease and ulcerative colitis, produces more significant symptoms and "can be debilitating and sometimes leads to life-threatening complications." *See Inflammatory Bowel Disease: Definition*, Mayo Clinic (Feb. 18, 2015), http://www.mayoclinic.org/diseases-conditions/inflammatory-bowel-disease/basics/definition/con-20034908; *see also IBD & IBS: Q&A*, Cleveland Clinic (Mar. 14, 2012),

impairments of Graves' disease, anxiety disorder, and affective disorder were found to be nonsevere. R. 26–27. The ALJ next determined that none of Farrish's impairments, alone or in combination, met or medically equaled the severity of a listed impairment. R. 27–28.

As to Farrish's residual functional capacity ("RFC"), the ALJ found that she could perform light work[3] with up to six hours of sitting and six hours of standing or walking in an eight-hour day; unlimited balancing; frequent stooping, kneeling, crouching, and climbing of ramps or stairs; and occasional crawling and climbing of ladders, ropes, or scaffolds. R. 28–37. He also determined that Farrish would need a restroom facility available in her place of work. *Id.* Based on this RFC and the VE's testimony, the ALJ found that Farrish could perform her past relevant work as a cashier and a receptionist, or alternatively, could perform other work existing in significant numbers in the national and regional economies, including hand packer, laundry worker, and office assistant. R. 38–39. He therefore concluded that Farrish was not disabled. R. 39. The Appeals Council denied Farrish's request for review, R. 1–3, and this appeal followed.

III. Facts

*A.    Relevant Medical Records*

Farrish's treatment notes date back to February 2003. R. 614–17. Prior to her alleged onset date, she received periodic treatment (including inpatient hospitalization) for a variety of gastrointestinal ("GI") symptoms such as diarrhea, abdominal pain, nausea, and rectal bleeding. *See* R. 614–17 (Feb. 21–24, 2003), 398–405 (Sept. 7, 2006), 438 (Oct. 21, 2006; Jan. 19, 2007),

---

http://my.clevelandclinic.org/health/articles/ibd-and-ibs-qanda (explaining differences between IBS and IBD).

[3] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

380–88 (Jan. 17, 2007), 441–42 (Jan. 30, 2007), 437 (Feb. 23, 2007). Treatment notes from her February 2003 hospitalization state that Farrish had been diagnosed with Crohn's disease two years earlier, but this had not been confirmed by colonoscopy or biopsy. R. 614–16. Imaging of her abdomen and pelvis during this period revealed generally normal findings. *See* R. 425 (Feb. 24, 2004), 423 (June 11, 2004), 418–20 (Sept. 7, 2006), 411 (Sept. 8, 2006). *But see* R. 392 (Jan. 17, 2007, pelvic CT scan findings compatible with inflammatory enteritis, with primary consideration of Crohn's disease), 464–66, 469–70 (Jan. 30, 2007, colonoscopy revealing ileitis, proctitis, and internal hemorrhoids, and biopsies taken during colonoscopy, showing no acute ileitis or colitis, but focal ulceration with inflammatory exudates noted in rectal sample). Farrish was also evaluated during this time for anxiety, *see* R. 614–17 (Feb. 21–24, 2003); musculoskeletal pains in her neck and knees, *see* R. 614–17 (Feb. 21–24, 2003), 421 (May 23, 2006), 378 (May 16, 2007); and hematuria, *see* R. 377 (Sept. 18, 2007), with no remarkable findings.

Following her alleged onset date, on December 5, 2007, Farrish reported to the emergency room at Prince William Hospital with complaints of nausea, vomiting, abdominal pain in the right upper quadrant, and diarrhea. R. 361–69. An ultrasound revealed sludge in her gallbladder, with no evidence of gallstones or gallbladder wall thickening, and mild dilation of the common bile duct of uncertain etiology. R. 375. During a surgical consultation on December 14, Farrish explained that the pain in her right upper quadrant was different that the pain she associated with Crohn's disease, which she reported had not bothered her for quite some time and was focused on her left side. R. 345–48. Because her signs, symptoms, and history of gallstones were consistent with cholecystitis, Farrish underwent a laparoscopic cholecystectomy (removal of the gallbladder). *Id.* On January 11, 2008, Farrish followed up with Arul Marathe,

5

M.D., her gastroenterologist, and stated that she still had trouble keeping food down and experienced continuing problems with abdominal pain and diarrhea. R. 435.[4]

Over the next few months, Farrish complained of other symptoms as well. On January 22, she reported having blood in her urine, frequent urination, pain and swelling in her legs and knees, lower back pain, and insomnia. R. 682–86. On February 26, she presented to Matthew Swartz, M.D., for evaluation of her GI symptoms and large and small joint swelling and pain in the lower extremities. R. 277–78. Dr. Swartz noted Farrish gained some relief from her joint pains through nonsteroidal anti-inflammatory drugs ("NSAIDs"), but she limited her use of these because they caused increased abdominal discomfort. R. 277. He also noted that in spite of her symptoms, Farrish "continue[d] to work full time as a county school bus driver." *Id.*[5] She was tender in the right upper quadrant of her abdomen, exhibited trace crepitus in the knees, and had slight tenderness on range of motion of the lower extremities. R. 277–78. Dr. Swartz opined that these findings did not support inflammatory arthropathy, but he prescribed a low dose of prednisone for trial use while Farrish awaited workup of her GI issues and abnormal liver functioning. R. 278. On March 11, Dr. Swartz wrote a letter to Joseph Chambers, M.D., Farrish's primary care physician, explaining his doubt that Farrish's musculoskeletal symptoms were related to IBD because she did not exhibit overt synovitis. R. 276. He continued to recommend a course of low-dose prednisone for diagnostic and potential long-term treatment purposes, and he opined that Farrish's GI condition may benefit from use of a biologic. *Id.*

---

[4] Dr. Marathe's handwritten notes are often difficult to read. Farrish interpreted these notes in a summary of the evidence that she submitted to ALJ Kilbane. *See* R. 168–78.

[5] At her hearing, Farrish maintained that she stopped working in December 2007, but took medical leave, thus remaining on the county payroll as an employee, until May 2009. R. 53. Records obtained by the state agency indicate earnings of $374.29 in 2008, but nothing in subsequent years. R. 189.

Farrish visited Dr. Marathe again throughout March, complaining of increasing abdominal pain in the right upper quadrant, diarrhea, and nausea, and Dr. Marathe noted that her blood work showed elevated liver enzymes. R. 432–34. Imaging taken on March 19 showed a moderately dilated proximal common bile duct of indeterminate etiology. R. 327. On April 8, Dr. Marathe performed endoscopic retrograde cholangiopancreatography ("ERCP") and sphincterotomy, revealing a dilated common bile duct with fusiform dilation, which raised a question of possible choledochocele abnormality. R. 285. The following day, Farrish reported to the emergency room with severe abdominal pain (distinct from her chronic pain in the right upper quadrant) and was hospitalized for acute pancreatitis secondary to the ERCP. R. 311–25, 461–62. Her Crohn's disease was noted to be relatively under control on Pentasa as she had not had diarrhea or bloody bowel movements. R. 315. She was discharged on April 11 once her pancreatitis resolved, with her chronic conditions diagnosed as sphincter of Oddi dysfunction and Crohn's disease. R. 309. Farrish visited Dr. Marathe again in late April and June, reporting continued episodes of abdominal pain in the right upper quadrant and diarrhea. R. 429–30. She also visited Dr. Swartz again on May 22, reporting that she had gotten some relief of her joint pain from prednisone, but discontinued it because it caused problems with her diet and her personality. R. 279. Dr. Swartz noted that Farrish's labs were negative for evidence of inflammatory process or immunologic disorder, and he deferred further treatment until her GI issues had resolved, commenting that anti-inflammatory drugs could be effective in treating joint pain, but would likely exacerbate the GI issues. *Id.*

On December 12, Farrish reported to the emergency room at the University of Virginia ("UVA") hospital with reports of diarrhea, nausea, vomiting, and exacerbation of her chronic

abdominal pain over the past week. R. 597–613.[6] She claimed that her stool frequency had

increased to ten to fifteen episodes per day, compared to her baseline of two to six per day. R.

598. The doctors mused that these symptoms must have "resolved upon arrival," noting that she

had no bowel movements on the day of her admission and two bowel movements on the second

day of her stay and that she felt nauseous during her stay, but did not have any reports of emesis.

R. 600. On examination, Farrish was diffusely tender around her abdomen, particularly in the

right lower quadrant and epigastric area, but she did not exhibit guarding, rebound, distension, or

abnormal bowel sounds. R. 598, 600. CT imaging showed mild intrahepatic and extrahepatic

biliary ductal dilation and thickening of the sigmoid colon and bowel wall suggestive of the

sequelae of prior inflammatory change rather than an active inflammatory process. R. 599. The

location of her pain away from the right upper quadrant suggested that her biliary dilatation was

not the likely cause of pain. R. 600. Workup for IBD was ordered, but it was thought that IBS

was a more likely diagnosis. *Id.*

On December 22, 2009, Farrish began treating with Lien Dame, M.D., at UVA. R. 623–

25. She complained of depression, stating that she had trouble sleeping, was fatigued during the

day, had occasional unprovoked crying spells, was sometimes irritable, and dealt with stress at

home because of financial difficulties and taking care of her two young grandchildren. R. 623–

24. She also complained about pain in her lower back on the right side that occasionally radiated

down her right leg, which she thought might be related to carrying her grandson around on her

hip. R. 624. She did not take Tylenol or ibuprofen for her pain because of problems with her

liver, but she did get relief from ThermaCare patches. *Id.* Dr. Dame prescribed a selective

---

[6] Treatment notes from this visit state that Farrish had visited another hospital on December 8, where she
was told she had pancreatitis and was given Percocet and an antibiotic. R. 602. They also note that an
MRI was taken on October 28 and a partial colonoscopy was performed in November. R. 598–99. No
direct documentation of these encounters appears in the record.

8

serotonin reuptake inhibitor ("SSRI") for Farrish's depression and Aleve for her back pain. R. 625.

Dr. Dame also noted that Farrish was being followed for Graves' disease by Christine Eagleson, M.D., in UVA's Endocrinology Department, and her GI issues were being followed by Dr. Brian Behm in Digestive Health. R. 624–25.[7] Farrish's Graves' disease was status post radioactive iodine ablation in April 2009, with resulting hypothyroidism, and she was awaiting the results of a recent blood test. *Id.* With regard to her digestive problems, Dr. Dame noted that Farrish's previous diagnosis of Crohn's disease had been modified to IBS after a series of colonoscopies were negative for Crohn's, and she ordered additional blood work to follow up on Farrish's history of abnormal liver function tests. *Id.* Almost one month later, Farrish was again evaluated by Dr. Dame and Joanne Coleman, N.P., for severe abdominal pain in the left upper quadrant. R. 622–23. She was referred to the emergency room at UVA, *id.*, but there is no indication in the record as to whether Farrish followed through on this referral.

Farrish followed up with Dr. Eagleson for treatment of her Graves' disease on April 14, 2010. R. 618–19. She was taking levothyroxine for treatment of hypothyroidism. R. 618. Farrish did not endorse hyperthyroid symptoms, but she did complain of some possible hypothyroid symptoms, including weight gain, constipation, cold intolerance, and dry skin. *Id.* Nonetheless, findings on physical examination were normal, and Dr. Eagleson noted that clinically Farrish appeared to be euthyroid. R. 618–19. Farrish does not appear to have treated with Dr. Eagleson again after this date, and on April 14, 2011, Dr. Eagleson mailed Farrish a letter (which was returned undelivered) dismissing her from treatment with the Endocrinology Department. R. 585–86.

---

[7] The record does not include treatment notes from Dr. Eagleson prior to this date or any treatment notes from Dr. Behm.

From August 26 to 29, 2010, Farrish was hospitalized for fever, nausea, vomiting, and dysuria related to a complicated urinary tract infection ("UTI"). R. 594–95.[8] She was found to have sepsis secondary to possible pyelonephritis and was treated with IV fluids and antibiotics. R. 594. When she followed up with Dr. Dame on September 9, she was asymptomatic as to her kidneys, but she stated that she had been very fatigued since being discharged from the hospital. R. 594–95.

Farrish visited Dr. Dame again several times over the next few months for treatment of her back pain. *See* R. 592–93 (Oct. 14, 2010), 589–91 (Mar. 17, 2011), 586–88 (Apr. 14, 2011); *see also* R. 584–85 (incomplete, unsigned, and undated report that Farrish attributes to a visit with Dr. Dame in May 2011, *see* R. 172). She complained of pain in her right lower and upper back and in her neck, along with joint pains in her legs, arms, and hips. R. 584, 587, 589, 593. Physical examination findings were mostly normal, although she occasionally exhibited limited range of motion and tenderness. R. 584–85, 587–88, 590, 593. Dr. Dame diagnosed Farrish with fibromyalgia, R. 588, and, after noting that multiple medications did not help or were not tolerated, referred Farrish to pain management and recommended an exercise program, R. 585. Imaging of her hands, feet, and hips taken during the summer of 2011 showed minimal narrowing of the bilateral interphalangeal joints, normal appearing sacroiliac joints with an arthritic assimilation joint on the left, and no evidence of arthritis, but possible osteopenia, in the feet. R. 490, 495–96.

On October 17, 2011, Farrish visited with Nandini Chhitwal, M.D., a rheumatologist, for evaluation of her joint pains. R. 525–27. Dr. Chhitwal noted that Farrish had recently started taking Plaquenil, which provided some relief from her hand pains, but she stopped taking this

---

[8] The record does not contain treatment notes from this hospitalization.

10

after some time because it exacerbated her GI symptoms.[9] R. 525. Dr. Chhitwal suspected that Farrish had seronegative rheumatoid arthritis, but was reluctant to start her on any new medications until she had a GI workup. R. 527.

On October 26, she visited with Jin H. Park, M.D., a gastroenterologist, complaining of abdominal pain, bloating, and diarrhea. R. 481–83. Dr. Park arranged for Farrish to be evaluated by CT scan, esophagogastroduodenoscopy ("EGD"), and colonoscopy; discontinued treatment with NSAIDs; and prescribed Prevacid, Vicodin, and Carafate. R. 483. The CT scan, taken two days later, was negative for any abnormalities in the abdomen or pelvis. R. 511. The EGD and colonoscopy, performed in February 2012, yielded findings of erythema in the whole stomach compatible with moderate gastritis, erythema in the first part of the duodenum compatible with mild duodenitis, normal mucosa in the terminal ileum and whole colon, and hemorrhoids in the colon. R. 791–802.

In December 2011, Farrish experienced abnormal urinary frequency and was treated for UTI and likely pyelonephritis. *See* R. 568–71, 666–69. On examination, she exhibited tenderness in her abdomen, back, and costovertebral angle ("CVA"). R. 569, 668–69. Her UTI resolved, but in January 2012 she still experienced back pain and exhibited abdominal and CVA tenderness. R. 663–65. On February 27, Farrish visited Dr. Dame again for treatment of her depression and fibromyalgia. R. 660–62. She reported that she had resumed taking Plaquenil, which provided some relief, and she wanted to switch to a new SSRI because the current one irritated her stomach. R. 660. She appeared fatigued, but otherwise exhibited normal signs on examination, and her medications were adjusted. R. 661–62.

---

[9] Farrish appears to have resumed taking Plaquenil by November, and as a result, blood tests were positive for benign neutropenia. *See* R. 537–40. She had discontinued this medication again by February 2012 because it aggravated her nausea and diarrhea. *See* R. 642–44.

11

On April 6, Farrish reported to the emergency department at Culpeper Regional Hospital ("Culpeper") complaining of sharp, moderately severe pain in her upper abdomen and diarrhea over the past four days. R. 718–22. She appeared uncomfortable and was moderately tender around the epigastrium and upper quadrants of the abdomen. R. 719. Her labs were normal and her CT scan showed a prominent common bile duct, which was not thought to be related to her symptoms. R. 720–21. She followed up five days later with Darren Baroni, M.D., a gastroenterologist, with continuing complaints of abdominal pain and notable tenderness in the epigastrium and right upper quadrant. R. 803–04. Dr. Baroni and Dr. Park doubted that a stone was present and scheduled a hepatobiliary iminodiacetic acid ("HIDA") scan to rule out sphincter of Oddi dysfunction. R. 804. The HIDA scan, performed in June, produced findings not felt to correspond to sphincter of Oddi dysfunction. R. 812.

Farrish returned to Dr. Chhitwal on July 10, complaining of pains in her hands, feet, and knees with morning stiffness and swelling in the knees. R. 687–90. She reported that she had been taking Plaquenil daily since April and took ibuprofen for pain. R. 688. She stated that she had recently been diagnosed with severe IBS and referred to a pain specialist, but also stated that she refused her pain specialist's offer of an injection in her back and that her nausea and diarrhea were stable. R. 687–88. On examination, she had full range of motion throughout, no synovits, and good hand grip, but was tender to palpation over the small joints of the hands and feet and had 4/18 tender points (bilateral hips and upper back). R. 689. Dr. Chhitwal recommended continuing with Plaquenil. R. 690. The next day, a rheumatoid arthritis series of X-rays showed no significant arthritic or degenerative change in the hands, wrists, or feet, but mild osteopenia in the feet. R. 693–95. The same day, she visited Dr. Park and reported that her GI symptoms were

partially controlled with Carafate and Prilosec, and Dr. Park referred her to another pain management specialist. R. 814–15, 822–24.

On October 23, Farrish complained of back pain and dysuria, but lab work did not show evidence of UTI. R. 787–88. On December 11, she returned to Dr. Chhitwal, stating that Plaquenil had helped with her joint pains and stiffness, but that these had returned after she went off the medication for the past couple weeks. R. 702–06. She also reported that she was alternating ibuprofen and Tylenol three or four times per day. R. 703. Her GI symptoms were stable. *Id.* On examination, she had full range of motion throughout, no synovitis, good hand grip, and tenderness to palpation over the small joints of the hands and feet. R. 704. Dr. Chhitwal increased her dosage of Plaquenil and recommended a trial of Duexis, an NSAID. R. 706. Ten days later, she visited Dr. Baroni with complaints of pain in the right lower quadrant of her abdomen, which she explained was different from her usual chronic pain, and several episodes of diarrhea per day. R. 825–26. On examination, she exhibited mild discomfort to deep palpation in the bilateral lower quadrants. R. 826. Dr. Baroni suspected that Farrish's symptoms were an exacerbation of IBS, and he declined her request for Vicodin, but recommended peppermint oil for spasms. *Id.*

On February 15, 2013, Farrish reported to the emergency department at Culpeper complaining of persistent dysuria, suprapubic pain, right flank pain, subjective fevers, chills, and persistent nausea. R. 739–44. She had visited another physician several days earlier and was given antibiotics for UTI, but these did not improve her symptoms. R. 739. On examination, she exhibited suprapubic and CVA tenderness. R. 741. A CT scan showed no acute abnormality involving the abdomen or pelvis. R. 744. She was diagnosed with acute persistent UTI and early right pyelonephritis, prescribed hydrocodone, and continued on antibiotics. R. 743.

13

Farrish visited Dr. Chhitwal on April 8, complaining of pain in her hands, feet, and neck. R. 711–15. She reported that she was taking Plaquenil, which she tolerated "okay"; alternating ibuprofen and Tylenol; and taking Phenergan for nausea, which was stable. R. 712. She also reported that nobody was managing her fibromyalgia anymore and that she was taking fluoxetine for anxiety, which helped her sleep. *Id.* On examination, she had full range of motion throughout, no synovitis, and good hand grip. R. 713. She was tender over the left fourth and right third proximal interphalangeal joints and all metatarsophalangeal joints, and she was positive for 9/18 tender points (bilateral ankles, right hip, bilateral anterior chest, and upper and lower back). *Id.* Dr. Chhitwal opined that these findings were benign from an inflammatory standpoint, but also found that Farrish's fibromyalgia pain was sub-optimally controlled, for which he recommended that she switch from fluoxetine to Cymbalta. R. 715.

On May 29, Farrish presented to the emergency department at Culpeper for evaluation of pain in her right lower back. R. 750–53. She exhibited decreased range of motion of her back on examination, but was nontender and had normal reflexes, full strength, and negative straight leg raise. R. 751–52. She was diagnosed with pain originating in the right sacroiliac joint and discharged with prescriptions for prednisone and Percocet. R. 752–53. She returned to the emergency department on June 23, complaining of pain in the right upper quadrant of her abdomen and of having trouble keeping food down. R. 754–58. She was tender in her right upper quadrant on examination, but otherwise exhibited normal signs. R. 755–56. A CT scan showed non-obstructive bowel gas pattern and no abnormal soft tissue calcifications. R. 761. She was discharged with prescriptions for belladonna alkaloids with phenobarbital and Zantac. R. 757–58.

14

Farrish followed up with Tinatin Khizanishvili, M.D., a gastroenterologist, on June 28, complaining of difficulty swallowing food and pills. R. 836–37. On examination, she had mild tenderness in the epigastrium and mild distension of the abdomen. R. 837. Dr. Khizanishvili assessed dysphagia, possibly caused by peptic stricture or other mucosal lesion, and IBS with chronic diarrhea. *Id.* She underwent an EGD on July 1, which revealed gastritis in the body and antrum of the stomach, esophageal spasm in the distal esophagus, esophagitis at the gastroesophageal junction, and Schatzki's ring at the gastroesophageal junction. R. 845–47. Biopsies of samples taken during the procedure were positive for mild, chronic gastritis and mild, chronic inflammation, but were otherwise benign. R. 848. The final treatment note in the record is from an August 28 visit with Dr. Park. R. 852–54. Dr. Park noted that Farrish had "a systemic autoimmune process" which caused vitiligo, Graves' disease, and arthralgias. R. 852. Farrish still experienced diarrhea and nausea daily. *Id.* Examination findings were normal, and she was continued on her medications for reflux and dysphagia. R. 853.

B.    *Opinion Evidence*

The record does not include medical opinions from treating physicians or consulting examiners. Instead, the only opinions in the record are those completed by DDS reviewing experts. On January 24, 2012, as part of the initial review of Farrish's claim, DDS reviewer Sandra Francis, Psy.D., assessed Farrish's mental functioning, finding that she had no restrictions of activities of daily living, no difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. R. 69–70. The same day, William Amos, M.D., assessed her physical functioning. He found that Farrish could lift or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours and sit for six hours in an eight-hour workday; frequently balance, stoop, kneel, and crouch; and occasionally

15

crawl and climb ramps, stairs, ladders, ropes, and scaffolds. Additionally, she should avoid concentrated exposure to vibration and hazards. R. 71–73.

On reconsideration three months later, Bryce Phillips, Psy.D., opined that Farrish's anxiety and affective disorders were non-severe and she had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. R. 91. DDS expert Luc Vinh affirmed Dr. Amos's physical RFC determination, except he found that Farrish was unlimited in her ability to balance, could frequently climb ramps or stairs, and had no environmental limitations. R. 92–93.

C.      *Farrish's Submissions and Testimony*

As part of her disability applications, Farrish submitted a function report on January 10, 2012. R. 215–22. She explained that on good days, she could do laundry, straighten up the kitchen, and take care of her grandsons if she felt "up to having them." R. 215–16. On bad days, however, she would only move between the bed and the couch. R. 215. Her children helped her take care of the dog. R. 216. Her impairments prevented her from being able to work, clean, do yardwork, garden, carry her grandchildren, cook, and bake, and she did not sleep well at night. *Id.* She could make simple meals, drive a car, and go outside occasionally. R. 217–18. She shopped for groceries twice per month and could handle money. R. 218–19. She spoke with her daughters and friends on the phone several days each week, but her impairments made her less social than she used to be. R. 219–20. Her impairments affected her ability to lift, squat, bend, stand, sit, climb stairs, complete tasks, and use her hands. R. 220. She could pay attention well and follow written instructions, but she had to take notes to follow spoken instructions. *Id.* She got along well with authority figures and handled stress okay, but she did not like changes in routine. R. 221.

16

At her administrative hearing, Farrish testified that she lived in a three-story home, but stayed on the middle floor because she had difficulty going up and down the stairs. R. 51. She last drove for work in 2007 and last drove a car privately in 2011 when she stopped driving because of difficulty with her concentration and vision. R. 51–52. Around the time she stopped working, she experienced constant abdominal pain, diarrhea, nausea, vomiting, and fatigue, and she had to use the restroom six to seven times during the day for ten to thirty minutes at a time. R. 52, 55–56. Her medications for arthritis, Graves' disease, and vitiligo worsened her GI symptoms and fatigue, and her symptoms limited her ability to concentrate throughout the day. R. 54, 56.

## IV. Discussion

On appeal, Farrish challenges the ALJ's determination of her RFC—the most she can do on a regular and continuing basis despite her impairments, 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). Her brief, ECF No. 15, is highly vague as to the nature of her objections. Most arguments take the form of legal boilerplate, and she does not cite to any part of the record in support of her contentions. Nonetheless, considering these objections along with the errors evident on the face of the ALJ's opinion, I find that remand is required.

A.    *Function-by-Function Analysis*

Farrish primarily objects to the ALJ's failure to perform a function-by-function analysis of her work-related limitations, particularly regarding the number of times she would need to use the restroom each day and her inability to stay on task. Pl. Br. 2–4. In assessing a claimant's RFC, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before the RFC may be stated

"in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."

*Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96-8p, 1996 WL 374184, at

*1). The ALJ's RFC assessment "must include a narrative discussion describing" how specific

medical facts and nonmedical evidence "support[] each conclusion" in the RFC finding. *Id.*

(quoting SSR 96-8p, 1996 WL 374184, at *7). *Mascio* does not set out "a per se rule requiring

remand when the ALJ does not perform an explicit function-by-function analysis." *Id.* Instead,

remand should be considered "where an ALJ fails to assess a claimant's capacity to perform

relevant functions, despite contradictory evidence in the record, or where other inadequacies in

the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki v. Astrue*, 729 F.3d 172,

177 (2d Cir. 2013)). Thus, the ALJ need not have explicitly set forth a detailed analysis for each

of Farrish's functional abilities as long as his conclusions are ascertainable from his narrative

discussion and supported by the record.

As to Farrish's GI symptoms, the ALJ determined that the record did not support the

degree of severity she alleged. R. 36–37. He found that she appeared to have exaggerated some

of her symptoms, noting for instance that she had limited bowel movements after being admitted

to the hospital at UVA in December 2008, despite claiming that she had recently experienced ten

to fifteen episodes of diarrhea per day. *Id.* (citing R. 598–600). This incident, although

noteworthy, seems insufficient to support a finding that Farrish was exaggerating her symptoms,

especially considering her doctors' suggestion that her symptoms had simply resolved by the

time she was admitted, *see* R. 600. Similarly, the ALJ found that Farrish's admission to the

emergency department at Culpeper in April 2012 undermined her credibility because she did not

exhibit tenderness or vomiting during her stay, despite having complained of diarrhea and

abdominal pain. R. 37 (citing R. 718–28). This finding, however, ignores part of the same

18

treatment note expressly stating that Farrish had abdominal tenderness on examination, R. 719, a discrepancy which the ALJ did not address.

More critically, the ALJ's evaluation of Farrish's GI symptoms, based on two isolated episodes during the relevant period, does not suggest that he considered the longitudinal record as a whole. This raises particular concern here because the ALJ's narrative discussion of the record, R. 29–35, omits a significant portion of Farrish's treatment history. For instance, although Farrish's GI impairment was chronic in nature and documented as far back as 2003, the ALJ did not discuss any of the record evidence from before the alleged onset date. The narrative discussion also leaves out many of the treatment notes from Dr. Marathe, *see* R. 429–36, several notes from Dr. Dame, *see* R. 594–95, 622–23, and notes from Dr. Baroni, *see* R. 803–04, 825–26, all of which pertained to Farrish's complaints of abdominal pain, diarrhea, and nausea, which were thought to be related to her IBS. Insofar as the ALJ's opinion can be read to state that Farrish did not need to use the restroom with any frequency beyond normal workplace tolerances, these omissions significantly undermine the assumption that his analysis was based on a comprehensive review of the record.

Likewise, the ALJ did not adequately evaluate the possible functional effects of Farrish's pain, particularly to the extent her pain was caused by fibromyalgia. This impairment "is defined as '[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause.'" *Johnson v. Astrue*, 597 F.3d 409, 410 (1st Cir. 2009) (per curiam) (quoting *Stedman's Medical Dictionary*, at 671 (27th ed. 2000)). It is, by definition, a diagnosis of exclusion, *see* SSR 12-2P, 2012 WL 3104869, at *2–3 (July 25, 2012), and is typically not accompanied by objective findings, *see Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[Fibromyalgia]'s symptoms are entirely subjective."). "The musculoskeletal and neurological examinations are normal in fibromyalgia

19

patients, and there are no laboratory abnormalities." *Johnson*, 597 F.3d at 410 (quoting

*Harrison's Principles of Internal Medicine*, at 2056 (16th ed. 2005)). As a result, "[s]everal

courts of appeals have held that ALJs may not rely on the lack of objective findings in

discrediting a treating doctor's opinion regarding the severity of a patient's fibromyalgia," and

"district courts in this circuit have recognized that a lack of objective findings is not a good

reason to discount a treating physician's opinion regarding the existence or severity of a patient's

fibromyalgia." *Ellis v. Colvin*, No. 5:13cv43, 2014 WL 2862703, at *8 (W.D. Va. June 24, 2014)

(collecting cases).

Here, the ALJ found that fibromyalgia was a severe impairment, R. 26, and many of

Farrish's symptoms were consistent with that disorder. *See Stahlman v. Astrue*, No. 3:10cv475,

2011 WL 2471546, at *6 (E.D. Va. May 17, 2011) (noting fibromyalgia is characterized by

"significant pain and fatigue, tenderness, stiffness of joints, and disturbed sleep"), *adopted by*

2011 WL 2470249 (E.D. Va. June 21, 2011). Despite acknowledging this, however, the ALJ

found that Farrish's descriptions of her pain were less than fully credible because the pain did not

manifest through objective signs such as joint swelling, reduced range of motion, or diminished

strength. R. 36. The absence of such signs, however, does not necessarily detract from a

claimant's allegations of severe fibromyalgia pain. *See Preston v. Sec'y of Health & Human*

*Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (discussing fibrositis). Likewise, the fact that Farrish

was encouraged to exercise does not, as the ALJ suggested, discredit her claims of severe pain

from fibromyalgia. *See Johnson*, 597 F.3d at 412 (explaining that physical therapy and aerobic

exercise are appropriate treatments for fibromyalgia). Although a recommendation to exercise

may be probative of whether her movement and strength were significantly limited, it says

nothing about Farrish's other limitations (such as diminished concentration and ability to stay on task) caused by her pain and related symptoms of fatigue and insomnia.

Some of the ALJ's other reasons for discounting Farrish's complaints of pain also ring hollow. For instance, he cites to Dr. Swartz's letter opining that Farrish's musculoskeletal symptoms were not likely related to her GI dysfunction. R. 36 (citing R. 276). That the etiology of her pain was (at that time) uncertain, however, speaks little to whether her allegations of pain were consistent with the record, particularly because the ALJ identified other impairments that could have caused Farrish's pain, including fibromyalgia, degenerative disc disease, and rheumatoid arthritis, as severe, R. 26. Likewise, although the ALJ found that medications were relatively effective in controlling Farrish's pain, R. 36, this finding disregards the numerous instances in the record in which Farrish stated that she could not tolerate NSAIDs and other pain medications because they exacerbated her GI symptoms. If the ALJ intended to state that this concern was no longer relevant because Farrish's other symptoms had stabilized to the point she could tolerate her medication, he did not clearly explain it. In addition, the ALJ's finding that Farrish claimed to be working full time as a bus driver in February 2008 (merely two months after her alleged onset date) relates to only a small part of the relevant period, and thus does not seem to be particularly germane to her allegations of pain throughout that entire period. Moreover, she earned $374.29 in 2008, R. 190, which certainly does not suggest extensive work. For these reasons, the ALJ's evaluation of Farrish's functioning, particularly as it relates to the frequency of her need to use the restroom and the non-exertional effects of her pain, is not supported by substantial evidence.

B.    *Medical Opinions*

Farrish also contends that "the ALJ improperly rejected the findings and opinions of the treating physicians." Pl. Br. 4. As the Commissioner correctly observes, Def. Br. 10, ECF No. 22, this argument has no merit because the record does not include any medical opinions[10] issued by Farrish's treating physicians. By contrast, Farrish's objection to the weight the ALJ gave the DDS examiners, Pl. Br. 4, presents a closer issue. Farrish challenges the ALJ's decision to give considerable weight to the opinions rendered by the DDS experts on reconsideration, even though those opinions, issued in April 2012, would not have reflected the entire treatment record, which extends through August 2013. On its own, the ALJ's decision to credit opinions that are based on a review of less than the full record would not necessarily be in error. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision."). Here, however, the ALJ's explanation of the reasons for his treatment of the opinion evidence is puzzling. Although he found the reconsideration opinions to be fully reflective of the record, he gave only partial weight to the DDS experts' opinions rendered on initial review in January 2012, on the grounds that those reviewers "did not have access to subsequent medical evidence." R. 37. The Court is unable to discern the ALJ's rationale for finding that the record was insufficient to form an opinion of Farrish's functioning as of January 2012, but became adequate to do so by April 2012. On remand, the ALJ should clarify the reasons for the weight given to the opinions in the record.

C.    *Consultative Examination*

---

[10] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

22

Farrish also contends that the ALJ should have ordered a consultative examination in order to further supplement the record. Pl. Br. 2. The Commissioner must purchase a consultative exam "when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on [the] claim." *Kersey v. Astrue*, 614 F. Supp. 2d 679, 695 (W.D. Va. 2009) (quoting 20 C.F.R. §§ 404.1519a(b), 416.919a(b)). Although the Commissioner has a duty to develop the record, the regulations require only that the "evidence be 'complete' enough to make a determination regarding the nature and severity of the claimed disability, the duration of the disability[,] and the claimant's residual functional capacity." *Id.* (citing *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). Thus, the Commissioner may properly decide not to purchase a consultative exam "when the record contains sufficient information" to make these findings. *Johnson v. Astrue*, No. 6:11cv9, 2012 WL 2046939, at *3 (W.D. Va. June 5, 2012).

Because I find that remand is necessary in this case for other reasons, I need not resolve this issue here. I note, however, that an in-person examination of Farrish may prove helpful in evaluating her functioning, as no such opinion currently exists in the record. I also note that the current record appears to be incomplete, as it includes references to treatment visits, but no direct documentation of those visits. *See supra* notes 7–9. If these records can be found, they may provide a more complete picture of Farrish's functioning during the relevant period.

## V. Conclusion

For the foregoing reasons, I find that the Commissioner's decision to deny Farrish's applications is not supported by substantial evidence. Accordingly, the Court will **GRANT** Farrish's Motion for Summary Judgment, ECF No. 14, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 21, **REMAND** this case pursuant to sentence four of 42 U.S.C. §

405(g) for further administrative proceedings, and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: March 30, 2017

Joel C. Hoppe
United States Magistrate Judge

Case 3:15-cv-00070-JCH   Document 23   Filed 03/30/17   Page 24 of 24   Pageid#: 969